EDWARD M. KNOX, Respondent, *v.* EDEN MUSÉE AMERICAIN COMPANY (Limited), Appellant.

*Certificate of stock — how far negotiable paper — estoppel — negligence — by-laws of a corporation — violation thereof by its officers.*

When certificates of stock are regularly signed by the president and treasurer of a corporation, bear the corporate seal of the company and are regularly issued to the individuals named in the several certificates, who have indorsed thereon in blank an assignment with a power of attorney to execute a transfer thereof upon the stock books, and such indorsements are witnessed, such certificates may be taken by lenders or purchasers without inquiry or other formality than that of delivery, because of the recognized assurance that the stock which the certificates represent cannot be transferred except upon the delivery and cancellation of the certificates.

A purchaser of the certificates of stock of a corporation containing its promise that a new issue of stock will not be made without a surrender of the certificates purchased is in the same position as a purchaser of a promissory note, payable to bearer, before the maturity thereof.

Choses in action generally pass by assignment, subject to equities, while negotiable instruments pass free from all equities, and secure to a *bona fide* purchaser the entire legal and equitable title.

The law of estoppel protects a purchaser of stock in a corporation not only against the rights of previous holders thereof but against the claims of the corporation itself

The owner of a certificate of stock indorsed by him in blank, which is subsequently wrongfully converted to the use of another, is estopped from asserting his title as against a *bona fide* purchaser.

A statement on a certificate of stock that the shareholder named therein is entitled to a certain number of shares of stock transferable upon the books of the company only upon the surrender and cancellation of such certificate, is a notification to all persons interested that whoever in good faith buys such stock and produces to the corporation the certificate regularly signed and with

a power of attorney to transfer the same. is entitled to have the stock transferred to him, and it assures the holder thereof that the corporation will not transfer the stock to any one not in possession of the certificate, and if a person acts upon the faith of such assurance, the corporation cannot be permitted to show that it was not true.

Negligence is a well-recognized foundation upon which to rest an estoppel in cases arising out of the wrongful transfer of stock.

The neglect by the officers of a corporation to obey a by-law thereof which directs the cancellation of all certificates of stock surrendered before the issuing of new certificates, is wrongful as against one who, were it not so held, would suffer from such neglect.  In failing to comply with such a by-law, the corporation neglects to perform a duty which it owes to the public, and if its neglect results in injury, there is secured to the person injured the right to be indemnified by the corporation.

One dealing with an officer of a corporation is put upon inquiry where the act of the officer would be illegal unless actually authorized, as, e. g., where securities offered for sale or as security by the officer are apparently the property of the corporation.

The possession of a certificate of stock in a corporation regularly issued to a shareholder named therein (and by him indorsed, in blank), by an officer of the corporation other than one having a part to perform in the execution of the certificate, is not, however, of itself sufficient to charge a buyer with the duty of inquiry.

Where a party attempts to assert, as against the corporation issuing them, the validity in his hands of certain certificates of stock under circumstances which require that he should succeed, unless his failure to observe an indorsement on the back of a certificate not in suit, but delivered at the same time, operates to prevent it, there is no basis upon which to charge his carelessness or omission to observe the indorsement on such other certificate with such consequences in an action upon the certificates actually indorsed in blank, nor can he be charged with contributory negligence for failing to observe the indorsement on the certificate not in suit, he having at the time supposed it to have been indorsed in blank.

APPEAL by the defendant, The Eden Musée Americain Company (Limited), from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the city and county of New York on the 21st day of June, 1893, upon the report of a referee.

This action was brought against the defendant corporation to recover the damages resulting from the defendant's refusal to transfer to the plaintiff fifteen shares of its capital stock.  In May, 1891, one Reynolds, an employee of the defendant, applied to the plaintiff for a loan of $2,500 upon his note indorsed by one Jurgens.

Jurgens was also an employee of the defendant, the general super-intendent of its business. The plaintiff knew that Reynolds and Jurgens were in the employ of the defendant and supposed that Jurgens was its managing director. He refused to lend the money without security, and Reynolds told him that they (meaning himself and Jurgens) owned twenty shares of the capital stock of the defendant, and he agreed to lend the money on that as collateral. Subsequently Reynolds brought to the plaintiff four certificates of five shares each — one issued to Mrs. Eva M. Chase, one to Seligsberg & Co. and two to Mrs. Hattie Z. Blish. They were in all respects regular in form and genuine certificates; they were all indorsed in blank by the persons in whose favor they were issued, except, that in the case of the certificate issued to Mrs. Eva M. Chase the name of Seligsberg & Co. was inserted as the attorney to make transfer on the books. The plaintiff examined the certificates and the indorsements, but did not observe that in the certificate issued to Mrs. Chase the blank was filled in as to the attorney to transfer. He made the loan on the note of Reynolds, indorsed by Jurgens, and the four certificates as collateral. Afterwards the loan was paid in part and renewed, and there remains still due to the plaintiff $1,800, with interest from March 2, 1892, on $800, and on $1,000 from January, 1892. The renewed notes being dishonored, the plaintiff applied to the defendant for a transfer of fifteen shares represented by the certificates, other than that to Mrs. Chase, on which he makes no claim. The defendant refused to make the transfer, and thereupon this action was brought.

The facts relating to the certificates are as follows: The twenty shares had been purchased by the firm of Seligsberg & Co., of which Mr. Hellman, the president of the defendant corporation, was a member. In April, 1891, Jurgens informed Mr. Hellman that one Siebrecht wished to buy twenty shares at $114 per share, and Mr. Hellman agreed to sell him these twenty shares. He took the certificates to the defendant's place of business, which was under the immediate charge of Jurgens, subject to Mr. Hellman's general supervision, and finding that Siebrecht was not ready to complete the purchase left the certificates in the company's safe in the office, giving instructions to Jurgens that when Siebrecht paid the money the transfer should be made. About three weeks later Jurgens sent

to Mr. Hellman at his office in New York city a new certificate for twenty shares made out to Siebrecht, complete except as to the signature of Hellman as president. This certificate was signed by Hellman, returned to Jurgens and delivered to Siebrecht, who paid the price of the shares, which was received by Mr. Hellman. The old certificates were not in fact canceled, but in the month of May, 1891, were used by Reynolds and Jurgens as collateral security for the loan made on Reynolds' note by the plaintiff as above related. In December or January following it was discovered that Jurgens was a defaulter, and soon after he disappeared. It does not appear that Reynolds knew of the fraudulent withdrawal of the certificates or knowingly participated in the fraud of Jurgens.

The defendant corporation was formed under the Business Corporation Act. (Laws 1875, chap. 611.) It had adopted a by-law that "all certificates exchanged or returned to the company shall be canceled by the secretary, and such canceled certificates pasted in their original place in the certificate book, and no new certificate shall be issued until the old certificate has been thus canceled and returned to its original place in said book." By the by-laws the certificates were to be signed by the president or vice-president and the treasurer. Mr. Hellman had been president from the formation of the company, and had always signed the certificates, except when he was for a short period out of the country. The certificate and transfer books were kept at the company's office in the safe, of which Jurgens alone had the combination. He had in effect had sole charge of these books, receiving old certificates and preparing new ones, obtaining the signatures of the treasurer and presenting them to the president for his signature. In every other instance in which Mr. Hellman, as president, had signed a new certificate, he had had presented to him the old certificate, and saw that it was canceled in fact before the new one was issued. In this particular case Jurgens did not send with the new certificates the old ones, canceled as was usual. The secretary had never attended to the canceling of the old certificates, and neither he nor the president, nor, so far as appears, any officer, had ever been in the habit of examining the stock transfer or certificate books or the returned certificates at the company's office. Their duties in this respect seem to have wholly devolved upon Jurgens, the general superintendent and

manager of the business. The business was the carrying on of a show in West Twenty-third street in a building occupied by the company for that purpose. Its capital stock was $400,000, of which $330,000 was actually issued. The receipts at the door were deposited in the bank by Reynolds. Jurgens did not handle the money, but he had been trusted with large amounts of jewelry and other valuables, and nothing had excited the suspicions of the officers of the company as to his honesty.

From the time the certificates in question were last seen by Mr. Hellman in the company's safe till Reynolds delivered them to the plaintiff as collateral to his and Jurgens' note, there is no evidence as to where they were. This was on the 8th day of May, 1891.

*Charles Steele,* for the appellant.

*Henry D. Hotchkiss,* for the respondent.

PARKER, J.:

The certificates of stock which lie at the foundation of this controversy are regularly signed by the president and treasurer of the corporation, bear the corporate seal of the company, and were regularly issued to the individuals named in the several certificates, who indorsed in blank an assignment with a power of attorney to execute a transfer upon the stock books, which indorsements were witnessed.

That the stock was properly issued, and the transfer indorsed thereon duly signed in blank by the shareholder is unquestioned, and thus, according to the established usage in the commercial world, they were acceptable to lenders or purchasers without inquiry or other formality than that of delivery, because of the recognized assurance that the stock which the certificates represented could not be transferred except upon the delivery and cancellation of the certificates.

It is true that the president of the company, who had become the holder and owner of the shares, surrendered them to the company in order that new shares might be issued in their place to one who had purchased the stock of him, and of right the stock should have been canceled.

But it was not, and later for value it passed into the possession of

one whom, for the purpose of the present inquiry, we shall speak of as a *bona fide* holder.

While they had been delivered to the officers of the corporation for cancellation, nothing had been written or stamped upon the certificates which evinced that fact, and they came first to the attention, and next to the possession, of the plaintiff without anything upon them which in the least tended to disclose that other certificates had been issued in their place.

It is difficult to see any reason why the purchaser of a certificate of stock under such circumstances should not be held to be in the same legal position as if he were the purchaser of a promissory note, payable to bearer, before maturity.

Both are transferable by delivery, and the certificate bears upon its face the promise of the corporation that a new issue of stock in its stead would not thereafter be permitted without a surrender of the certificate.

The object of the assurance was to induce the public to purchase them more readily, because of their easy convertibility. And when we consider the volume of daily transactions in stocks, and have in mind that stocks of railroad corporations in this country alone aggregate a little over $4,600,000,000, with shares in banking, business and other corporations almost without number, it would seem to be of the highest importance that the public should be reliably assured that certificates of stock purchased by them in good faith, with a transfer indorsed in blank, entitles them to protection, not only against a claim by a prior owner that he has not parted with it (*McNeil* v. *Tenth National Bank*, 46 N. Y. 325), but also from a claim by a corporation that the stock is invalid, because surrendered for cancellation and new stock issued in its place.

There seems to be no good reason why, to such an extent, at least, such certificates should not be deemed to have so much of the attributes of negotiable securities as to make them unassailable in the hands of purchasers in good faith and for value.

It must be admitted that the weight of authority, numerically considered at least, has pronounced against the applicability of the word negotiable, as describing the quality of stock certificates. (Beach on Private Corporations, § 677; Cook on Stock and Stockholders, § 412.)

Mr. Beach in his work on Private Corporations, as well as some other text writers, has manifested a disposition to regard the expression *quasi* negotiable as more aptly descriptive of the character of the instrument, which carries with it to its purchaser in good faith assurance of protection grounded on the doctrine of estoppel — the foundation upon which the estoppel is rested being that the title of an innocent purchaser necessarily comes through acts of the real owner — which makes it possible for any one to purchase the certificates in the belief that his vendor is vested with title and authority to make a valid and effective sale, and do not depend upon the rights of the apparent owner in any degree.

This doctrine has been so extended that a *bona fide* purchaser of stock for value is protected by estoppel in almost every case in which he would be as the holder of a negotiable instrument.

If this be a correct statement of the rule, the necessities of the commercial world in dealing in stocks are as fully recognized, in so far as the protection of the *bona fide* purchaser is concerned, as if certificates of stock were treated as or termed negotiable.

Protection of the *bona fide* purchaser is the matter of moment; what it may be termed is not of the least account.

Morawetz in his work on Private Corporations (2d ed., § 185) bases the statement following, on the decisions mainly of New York courts : " By general mercantile usage shares in a corporation are assignable by indorsement and delivery of the certificate issued to the owner as evidence of his rights.  It is well settled that, after a certificate for shares has been indorsed by the holder, with an assignment and power of attorney to execute a transfer upon the stock books, the name of the transferee and attorney being left blank, the certificate thus indorsed may be passed from hand to hand, and the last owner will be entitled to fill up the assignment and power of attorney and complete the transfer by entry upon the books of the company."

Among the early cases in this State, where a stock certificate, after an indorsement in blank upon the back of it by the holder, for the purpose of having it used as collateral security for a loan, was pledged by the party to whom it was delivered to obtain a loan in his own behalf, was *Kortright* v. *Buffalo Commercial Bank* (20 Wend. 91).

The certificate was for 100 shares of bank stock, and the bank refused to transfer the certificate on its books when requested to do so, notwithstanding that the assignment and power of attorney over the signature of the original owner of the stock had been duly filled out. The court said that the assignment and power of attorney was in "strict conformity with the universal usage of dealers in the negotiation and transfer of stocks according to the proof in the case.

"Even without the aid of this usage there could be no great difficulty in upholding the assignment. The execution in blank must have been for the express purpose of enabling the holder, who-ever he might be, to fill it up. * * * The filling up is but the execution of an authority clearly conveyed to the holder, is lawful in itself, and convenient to all parties, as it avoids the necessity of needlessly multiplying transfers upon the books."

*N. Y. & N. H. R. R. Co.* v. *Schuyler* (34 N. Y. 30) was a suit in equity to have certain alleged false and fraudulent certificates and pretended stock of the corporation adjudged void, and to compel the certificates to be brought into court and canceled.

The court, in discussing the character of stock corporations, said, at page 82: "Now, while the corporation could not give to a cer-tificate of this kind negotiability in its legal commercial sense, it could and did approximate to that characteristic, as nearly as legally pos-sible, for the purpose of making its stock more valuable by the case with which its certificates could pass from hand to hand by simple delivery. * * * But it was essential to make these certificates in a form to secure public confidence, and this could only be done by making them solemn assurances of rights. Hence, by its by-laws, the corporation declared that the stock represented by them should never be transferred, except upon the delivery and cancellation of the certificates; and this provision, in effect, is embodied in the certificate itself. * * *" To the purchaser of the stock from its stockholders it "assured safety in purchasing the certificates, by declaring that the stock should only be transferred upon its surrender and cancellation."

In *McNeil* v. *The Tenth Nat. Bank* (46 N. Y. 325) the plaintiff delivered to his brokers a certificate of certain shares of stock to secure any balance of account, having previously indorsed thereon

the form of an assignment and a power of attorney to make all necessary transfers.

The name of the transferee and attorney and the date were left blank. Subsequently the brokers, without authority, and without plaintiff's knowledge, pledged the scrip to secure a loan to themselves; defendant paid the loan and received the securities. It was held that it was estopped from asserting its title as against the plaintiff.

Judge RAPALLO, speaking for the court, said: "The holder of such a certificate and power possesses all the external *indicia* of title to the stock, and an apparently unlimited power of disposition over it. He does not appear to have, as is said in some of the authorities cited concerning the assignee of a chose in action, a mere equitable interest, which is said to be notice to all persons dealing with him that they take subject to all equities, latent or otherwise, of third parties, but, apparently, the legal title and the means of transferring such title in the most effectual manner."

Judge RAPALLO thus makes the distinction which obtains between what is assignable, as are choses in action generally, and instruments which contain certain elements of negotiability. The one passes by assignment and is taken subject to equities, while that which is negotiable is taken free from all equities, and secures to the *bona fide* purchaser the entire legal and equitable right. This element of negotiability was presented in another form in *Leitch* v. *Wells* (48 N. Y. 585).

The doctrine of constructive notice by *lis pendens* filed in a pending action was sought to be made applicable to a subsequent purchaser of certain stock. Plaintiff's contention was not upheld, the court saying, at page 613: "Stocks are articles of commerce, and the dealings in them every business day of the year far surpass in value the dealings in any other species of personal property. They pass from hand to hand in commercial transactions like negotiable notes or bills of exchange. They are sold and pledged, and in many ways form the basis of credit."

Since the decision of the case of *McNeil* v. *Tenth National Bank*, above cited, certificates of stock with blank assignments and powers of attorney attached must be nearly as negotiable as commercial paper. The doctrine of constructive notice by *lis pendens* has never been applied to such property.

In the case of *The Fifth Avenue Bank* v. *R. R. Company* (137 N. Y. 231) the court recently said : " While certificates of stock in railroad and other business corporations do not possess the qualities of commercial paper in the full sense of the term, yet, as evidence of title, when the transfer indorsed thereon is signed in blank by the shareholder, they become in effect, so far as the public is concerned, as if they had been issued to bearer.   They are then readily transferable by delivery and have an element of negotiability which renders them an important factor in the financial and commercial transactions of the country.   *   *   *   The plaintiff must, therefore, be accorded whatever advantage belongs to a holder in good faith of a chose in action of this character."   While protection to the *bona fide* purchaser of stock indorsed in blank has been worked out by means of the doctrine of estoppel, it seems to have at last reached a point in process of development which justifies the statement following which we take from Cook on Stock and Stockholders, section 16 :

" This law of estoppel protects the purchasers of stock in a corporation, against not only the rights of previous holders, but against the claims of the corporation itself.   Indeed, to such an extent has the law of estoppel been applied to protect a *bona fide* purchaser of stock, that he is protected now in almost every instance where he would be protected if he were purchasing a promissory note or other negotiable instrument."

The holder of a certificate of stock who indorses it in blank, which is subsequently wrongfully converted to the use of another, is estopped from asserting his title as against a *bona fide* purchaser. For the same reason this defendant would seem to be estopped from challenging the validity of this certificate.   Under the seal of the corporation, supported by the genuine signatures of two of its officers, the present holder was informed, by statements appearing upon the face of the certificate, that the shareholder named therein was entitled to a certain number of shares of stock, which could be transferred upon the books of the corporation in person, or by attorney, whenever the certificates should be surrendered, but not otherwise.

In the language of DAVIS, J., in *Bank* v. *Lanier* (11 Wall. 378) : " This is a notification to all persons interested to know that who-

ever in good faith buys the stock and produces to the corporation the certificates regularly assigned, with power to transfer, is entitled to have the stock transferred to him, and the notification goes further, for it assures the holder that the corporation will not transfer the stock to any one not in the possession of the certificates." It is difficult to see how it is possible for the corporation to make a statement calculated to more thoroughly persuade a purchaser that the stock was still outstanding and valid. And the plaintiff having acted upon the faith of such assurance, the corporation cannot be permitted to say that it was not true.

If the position thus taken be correct, there remains for consideration the question whether plaintiff is a *bona fide* holder. The learned referee, however, predicated defendant's liability upon the ground of negligence, which is a well-recognized foundation upon which to rest an estoppel in cases arising out of the wrongful transfer of stock.

His finding of negligence on the part of the officers of the corporation, if it has support in the evidence, commands the conclusion reached by him, that the defendant is estopped from challenging the validity of the certificates in controversy. That the finding is justified by the evidence adduced is readily apparent. It has for a long time been the rule with corporations to provide that where certificates of stock were exchanged or returned to the corporation, such certificates should be first canceled and returned to their original place in the certificate books before a new certificate should be issued in their place. This, experience had taught to be necessary :

*First.* In order to protect the corporation against the returned certificates being wrongfully put into circulation again by officers, employees or others, who might in some way obtain access to them.

*Second.* As the public are invited to purchase securities, it is the policy of corporations to have them regarded as equally as safe to deal in as negotiable securities. The protection of the corporation was attempted to be secured by a by-law requiring surrender and cancellation before the issue of a new certificate. But to assure the public against any possible apprehension of difficulty lest a new certificate should have been issued in the place of the one offered for sale, the certificates on their face declared that a new certificate should only issue after the surrender, cancellation and return to its

place in the certificate book of the old one.    Now, this corporation had a similar by-law, and made a like representation on the face of the stock certificates issued by it.

The occasion for it was well understood.    It constituted a part of the business learning of the time.    The necessity of carrying out the by-law and the promise of the certificate was as apparent as that the occasion required both the by-law and the promise.    Neglect of the officers to follow the by-law under such circumstances could not be otherwise than wrongful as against one who, were it not so held, would suffer from the neglect.    The situation is not one where the officers of a corporation can say, " it never happened to us before; and, therefore, we had no reason to apprehend it," for it was the experience of other corporations, which they knew so well that they attempted to guard against misadventure in the manner described. But, while the by-law was duly made, it was not enforced.

And in failing to comply with this rule of well-recognized necessity, which it pledged itself to comply with on the face of its certificates, it neglected to perform a duty which it owed to this plaintiff as one of the public.    That neglect having resulted in injury to this plaintiff by reason of it, there is secured to him the right to be indemnified by the defendant.

This brings us to the question whether the plaintiff was a *bona fide* holder.

It was so fully discussed by the referee as to require but little more than a statement that his conclusion is indorsed.    The plaintiff was applied to by Reynolds for a loan upon the notes of Jurgens and himself.    He refused to make the loan without security. Thereupon the certificates in question were offered and accepted as such.    He had no actual notice of any want of title on the part of Jurgens and Reynolds.

But it is urged that as Jurgens was the general superintendent of the defendant, and Reynolds an employee, of which fact plaintiff had knowledge, that he was put on inquiry touching the validity of the certificates.    In other words, that if an intending purchaser of stock knows that the would-be seller is an officer or employee of the corporation which issued the stock, he is put on inquiry and thus becomes chargeable with constructive notice of everything to which that inquiry would reasonably have led.

In *Wilson* v. *M. E. R. Co.* (120 N. Y. 145) the party discounting the notes of the corporation had knowledge that the proceeds were being applied to the personal use of the president of the corporation. And it was held that *prima facie* the act was unlawful, and unless actually authorized, the purchaser would be deemed to have taken them with notice of the rights of the corporation — a rule which accords with a sound public policy, for corporations have no authority to loan their notes or securities to their officers for use in their own personal transactions. So, when a person is invited to buy, or loan money to an officer of a corporation, upon the faith of securities, and such securities or obligations appear to belong to the corporation, he is charged with the duty of inquiry, because agents do sometimes exceed their authority, and when the situation presented is such as to lead an ordinarily prudent man to question the right of the agent to do a certain act, he who deals with him does so at his peril. Public policy requires such a rule. If it were otherwise, so that it would be sufficient to shut the eyes and say, " I did not see," dishonest, although trusted, agents would have no difficulty in finding ready capital to aid them in enterprises undertaken on the strength of the assets of corporations.

A type of the cases which call for the application of the rule is furnished by *Bank of New York National Banking Association* v. *The American Dock & Trust Co.* (53 N. Y. St. Repr. 905). But, as the rule is well grounded in reason, it has never been so far extended as to embrace such a case as this.

These certificates do not purport to belong to the corporation. On the contrary, they appear to have been, as was the fact, issued to the shareholder named in each of them, and by her indorsed in blank so as to be readily transferred by delivery from person to person, until some holder should desire a new certificate.

They contain nothing which would induce the suspicion that new certificates had been issued in their place ; on the contrary, they severally have the assurance of the president and treasurer that this could not be done until the certificates should be canceled.

As neither Reynolds nor Jurgens occupied the position of either president or treasurer, it was evident that they were without the opportunity to issue new stock. But further discussion of this question need not be indulged in. It is apparent that the possession of

a certificate of stock of a corporation, regularly issued to a share-holder named therein, and by him indorsed in blank, by an officer of the corporation, other than one having a part to perform in the execution of the certificate, is not of itself sufficient to charge a buyer with the duty of inquiry.

There was a fourth certificate not in controversy here, which was not indorsed in blank, but regularly filled out, and it is said that plaintiff was thus put in possession of a fact which should have led him to doubt the ownership of the certificate by Jurgens and Rey-nolds. In the first place, the evidence which the referee fully credits is to the effect that plaintiff did not observe that it had been filled out. That being so, the situation presented is that of a party attempting to assert, as against the corporation issuing them, the validity in his hands of these certificates of stock, under circum-stances which command his success, unless his failure to observe an indorsement upon the back of a certificate not in suit, but delivered at the same time, operates to prevent it. It is difficult to see any basis upon which to charge his carelessness with such consequences.

The appellant contends that he cannot recover because of his contributory negligence. Here were four certificates presented to him. He found some of them, and he supposed all of them, indorsed in blank. In that he was mistaken. His examination was not sufficiently careful. By reason of it he took one certificate which he cannot enforce against the corporation, but does that deprive him of the right to enforce his cause of action upon each of the other certificates ?

There was no negligence as to them or any of them. They proved to be indorsed as he had supposed.

The situation does not admit of the application of the doctrine of constructive notice. The appellant suggests otherwise, but does not support the suggestion with decisions.

The judgment should be affirmed, with costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment affirmed, with costs.